Good morning, Your Honors. May it please the Court, my name is Avantika Shastri, and I'm representing petitioners Adania Rosales-Picen and Victor Rosales, who are both in court today. I'd like to reserve three minutes for rebuttal. The Court should find that each of the decisions below in this case should be reversed and remanded. A review of each decision shows that the Board either misunderstood the law or failed to properly consider a petitioner's claim to ineffective assistance by their two prior counsel, Miguel Gata and Martine Guajardo. In particular, I would like to address three points today. First, the Board was incorrect in finding that Ms. Rosales' claim to asylum, based on domestic violence, would not have been sustainable while she's represented by Mr. Gata, her first prior counsel. Before jumping into the merits of this argument, I'd just like to point out that this is the only reason the Board gave for dismissing this claim. Therefore, what  the Board gave for dismissing this claim. So the sustainability of this argument is the only issue that the Court need consider in respect to her application for asylum based on domestic violence. Could I ask you a point just for clarification? You have two petitioners here. Very often, it's referred to that they're married to each other, and yet the record shows that your male petitioner has a wife and family in Guatemala, and we find out that your female petitioner has been married before. But there's no indication of a severance of any of those marriages, and I couldn't quite understand, have they gone through a marriage procedure, or is there something I'm missing? It's not in the record, Your Honor, but yes, they have been married in California and previously divorced their prior spouses. But you have to get a divorce before you can get married. Right. So they did do that, but the evidence of that is not in this record. I see. So the woman that came up with a male petitioner, his wife, and then went back down to take care of his four children, he divorced her where? I believe it's in Guatemala, Your Honor. I'm not positive about that. He returned to Guatemala and divorced her and then came back? I don't know the specific facts about the divorce from the top of my head. And then in part of the record, it says that she came here with her brother, not with the petitioner. I take it the petitioner is not her brother, it's her cousin? Yes. So she came with the brother, and he came with his then-wife, who was pregnant with his fourth child. And then she went back, and then the two of them somehow got divorces from their spouses and then remarried here. Is that right? She came with him as well. There was an error in the translation during the immigration court proceedings that she said her brother, but what she meant was, in Spanish, she meant, he's referred to as her cousin brother. So she came with him as well to the United States. Her actual biological brother was already living in the United States at that time. So it was her cousin, not her brother, that she came with? Yes. Behemono is not a word that's mistaken for cousin. Apparently there was some mistake in the record that wasn't corrected. Right. We explained it in the motion to reopen that we filed, but it wasn't previously corrected by her first or second counsel. Okay. So, I'm sorry. I should state that I'm not sure that I agree with the first proposition you started with. That is that all we have to look is whether the legal argument is sustainable or not. As I look at the BIA's decision, it casts a broader net than that. It spoke specifically in terms of whether the first attorney was incompetent for having failed to raise that, saying it was not clear it was sustainable, among other things. So why is it that you think all we have to do is pretend that we shoot back in time 10 years and act like we're the BIA then, listening to an argument being made fresh? Isn't the burden somewhat heavier than that? Well, in this case, the Board says that it's not ineffective assistance for an attorney to raise an issue which is not yet decided, and then proceeds to say that where it was not clear that a claim based on domestic abuse is sustainable. That's a little different than saying where a claim based on domestic abuse is not sustainable. It's saying it's not clear. It's not clearly developed. The law is in flux, and we don't fault attorneys for not necessarily anticipating which way it's going to go. Right. Certainly, Your Honor. In this case, though, the agency position on the issue of domestic violence-related asylum claims was clear. As of 1995, CIS issued a memo to its asylum adjudicators, saying that look for this issue in the claims of people who appear before you, and these gender-related asylum claims, which include domestic violence, can fall within the parameters of the traditional asylum law. So at the time of her immigration court hearing in 1999, that was the existing agency position that was applied to her case. But the Board's point is that the Board's decisions at that point were not clear, and I suspect the practitioners are paying more attention to what the Board says than what's being said in internal agency memos. Well, actually, in this case, the Board's analysis of its own prior case law was incorrect. The Board suggests that the proper decision that Petitioner or her counsel would have relied upon is matter of RA, but in fact, that was a negative decision in her case, and the critical fact was is that that decision was vacated, and the Board's decision here doesn't recognize that it's a vacature of its prior decision that showed that domestic violence claims remain viable for as a basis for asylum, and the agency's never retreated from that position since that time. Do you have any authority to cite a Board decision or a court decision that affirmatively recognized the defense by that, the argument by that time, the ground for asylum by that time? I'm sorry. Can you restate the question? You're basing an argument on vacating of the decision upon an internal memo. Neither of those strike me as clear announcements to the bar as to the position that's being taken by the agency. Do you have something in the form of either a precedential decision of the BIA, a decision of this Court, something that lawyers should be expected to be familiar with? Well, in immigration practice, so much of the case law is based through agency determinations. So that's why I cite BIA. Do you have any precedential decisions from the BIA? Right. But we do have a decision. We have proposed regulations by the Department of Justice. And that's what I'm getting to. If it's not clear, then I think you do have an issue that needs to be dealt with, with regard to whether that constitutes ineffective assistance, because ineffective assistance is not right or wrong. It's whether the performance was beneath what we consider to be professional, and that can sometimes reach pretty low. And it's prejudice. So I just quarrel with your first proposition, that we have to pretend like we're the BIA in 1999. I don't think that's the question before us. There's another question before us also, is whether this makes any difference. That is, she had an adequate opportunity herself to make this presentation at the time she testified under oath. And you'll recall from reviewing that, she was asked why she had not tried to move to another part of Guatemala to avoid the problems she was having. And her response wasn't, I can't, I can't stay in Guatemala. I have an ex-husband that's trying to beat me. She said, I thought it would just be better once and for all. There was no mention of harm that she feared. There's nothing that she feared guerrillas or anyone. But she just thought it was time to move on. With that kind of testimony in the record, it's pretty hard to say there's any prejudice here, even if you're sustained on the first count. Well, in this case, I mean, she didn't, she, part of the ineffective assistance provided by Mr. Gata and Mr. Guajardo was failing to properly advise her and elicit the relevant. Advise her what? How to tell the truth. She's asked a specific question. She's telling the truth. I left. Now, the lawyer's not going to say, lie and say something else. I see your argument that he didn't bring it up. But the record itself demonstrates her statement and her oath that that's not a viable claim, doesn't it? Well, she had previously stated her fear of the guerrillas in her testimony. So at that point in time, she wouldn't have necessarily thought it was. She didn't. She didn't. I just read to you what her testimony was. She was asked specifically the question, why she didn't move to another part of Guatemala. And she didn't say, because I have a husband that's trying to beat me. She says, no, it's just time to move on. I don't see how you can, based on that record, say there's any prejudice, even if you establish the first part. Well, throughout her prior proceedings, she wasn't aware that the domestic violence against her by her husband was relevant to her asylum claim. It's true. But she was asked for her motivation for going to the United States. That's the problem, you see. And she was under oath. There was no one around that was going to beat her or anything. She's in the United States. All she has to do is tell the truth. We assume she told the truth. But if that is the truth, then it invalidates that argument that you have, because there's no prejudice, right? I don't believe she answered that fully understanding the implications of that question and what was relevant for the purposes of the immigration court hearing. It's not that she intended to lie. Okay. So as I was saying, a claim to asylum based on domestic violence, our position is that the only thing the court needs to look at in regards to that question is whether or not it would have been sustainable. And under the agency position throughout the time of her immigration court and the board proceedings, it would have been sustainable based on the agency's position in its guidance, in the proposed regulations, in the AG's vacature of matter of RA. All of these are typical signs that immigration practitioners look at for guidance as to how agency law develops on these subjects. And her right, and this court has found in Lynn B. Ashcroft that a right to a full and fair representation of a claim includes the right to have an attorney present a viable legal argument on a client's behalf supported by relevant evidence. And in this case, a claim to asylum based on domestic violence would have been viable at that time, but it was never put forward. Second, we find that the board's decision fails to show any consideration from Ms. Rosales' claim that Mr. Goddard and Mr. Guajardo provided ineffective assistance in regards to a political asylum claim. The board stated that it denied this claim because she's merely re-arguing the merits. However, this reasoning shows no consideration of a new evidence provided of ineffective assistance, which is distinct from the underlying merits of the claim. And second, even if we assume that the new evidence of ineffective assistance is distinct from the underlying merits. Well, it's the new evidence that she wasn't properly advised by prior counsel as to what kind of evidence to submit, and she wasn't able to submit the evidence because prior counsel didn't properly investigate what evidence she had and properly advise her, you know, the evidentiary requirements of what to submit on the record. Are you talking still about this issue of her ex-husband that she talks about? No. This relates to her original political asylum claim and additional evidence that could have been brought forward in respect to that claim, which prior counsel never properly investigated or presented, such as those untranslated death certificates, such as her testimony about. Well, how does any of that really matter in the context of the changed circumstances found by both the IJ and the BIA? Well, as we argued in our motion to reopen to the board, she also had, she had a claim to past persecution as well, based as well on humanitarian asylum, given what she'd experienced in Guatemala, and that was never considered by the court, even if it were to find that she doesn't, no longer has a future fear of persecution. This also, though, was not the basis of the board's decision in this case. In changed circumstances, that's not, that's not something you can put aside just by saying I was persecuted in the past. In changed circumstances, with the burden shifting, something that can cause the IJ or the BIA to acknowledge, yes, there's been past persecution, but the circumstances in Guatemala are entirely different, and in fact, that's what's been decided in several cases. So don't the changed circumstances kind of trump the additional evidence you argue could have been offered earlier with regard to past persecution? Well, as I said, a claim to asylum based on humanitarian purposes doesn't look at the current circumstances, and so that would have also remained legal. What's so dramatic about her case that she qualifies there? She was a young, she was a minor at the time that most of these events happened. She was acting as an informant with her family. She suffered no personal harm. Her family certainly suffered, but she didn't. Her mother remained in Guatemala without harm. Under Ninth Circuit law, harm to family members, especially the gruesome, the murders of her father and her brother, can constitute persecution. But you're not talking about persecution. Now, you're trying to establish extraordinary circumstances for humanitarian relief, and her case really isn't that extraordinary. Well, we're establishing that the past persecution she experienced was sufficient to warrant a finding that she does not need to return, not that extraordinary circumstances for some discretionary humanitarian relief. Let's play through this. Past persecution doesn't end it because then there's changed conditions, and the agency has several times found changed conditions in Guatemala. You respond by that by saying, well, humanitarian relief. But when I ask you what's the basis for that, because her story isn't that extraordinary, you go right back to past persecution, which isn't enough by itself because you've got the changed country conditions. I mean, I don't see how this changes anything. I have just 30 seconds remaining in my time. I can respond or else I'd like to reserve it for rebuttal. You can respond. We'll still give you a minute. Okay. Again, the claim to humanitarian asylum is not looks at the past persecution. And in this case, we would argue that there's much more evidence of past persecution than was presented previously. We're not asking for it to be simply based on the conditions now, but based on what she had previously experienced and that that rises to the level of persecution. Are you contending the fact that past persecution automatically qualifies somebody for humanitarian asylum? No, but when it can be so. What additional elements are you offering up that makes this person qualify or would have qualified at the time for humanitarian asylum? When I asked that question, the answer you gave me was past persecution. And you've just agreed that's not enough. I'm still missing the additional piece that you need. The past persecution in this case, Your Honor, was that she was a very young woman at the time these events happened. She saw her brother and her father killed. She's had other family members who were threatened with death. She herself received death threats living in Guatemala. Her mother, the testimony of her mother was confused in the record below because it wasn't properly explained to her the difference between her stepmother and her mother. Her stepmother, who lived with them at the time that her family was acting as an informant, has since fled Guatemala and no longer lives there. Her biological mother lives in Guatemala, but her biological mother did not have anything to do with the family and was not associated with the family at the time that they were assisting the Guatemalan government in fighting the guerrillas. Okay. Could I ask just, I know you're tying this up, but are you still pursuing the claim of the husband? Yes, Your Honor. Yeah. Maybe you could explain this to me. It was confusing to me in the record. He had some problems, so he left his home, and for 10 years, according to the record, he was completely safe in the place he went to. Then he missed his parents and his wife and his children, so he came back. And then there's a question as to why he left and came to the United States with his wife, who was then pregnant. And then there was testimony that he had of why he didn't return with his wife. It was decided she would go back. And this is the striking part that I wanted you to refer to. This is the IJ record of his testimony. Let's see. The respondent states, however, that his spouse returned to Guatemala in April 1990 in order that she might be with the couple's children, who were then in custody and care of their maternal grandmother. The respondent and his spouse decided that he should remain in the United States in order that he might work here and send funds to the family. Now, that has nothing to do with any fear of any problem in Guatemala that he felt at that time. Doesn't that sort of undercut the real reason, the truthful reason, why he stayed here was to get a job, which is consistent with what one of her prior lawyers sent in a letter? No, Your Honor, I believe that to be an incomplete explanation of why he stayed here. Certainly he may have stayed here in part for economic reasons, but he also did not return because he feared returning to Guatemala. As he mentioned, he did move to another part of Guatemala where he resided for about 8 to 10 years. However, his testimony, as clarified in the motion to reopen, is that during that time he stayed out of sight, he stayed hidden, but, however, he then decided to return back to his hometown initially because members from his hometown were then moving to this town of Salama. He didn't want to be seen, but he didn't. They could recognize him at that point. But he didn't return to his haven that had been safe for 10 years. He went to the United States, and then there's this testimony of why he didn't go back, which was inconsistent with the testimony he has now, isn't it? It's not inconsistent, Your Honor. I believe that's incomplete as to why he didn't go back. Okay. Thank you. It's not mutually exclusive. Good morning, Your Honors. May it please the Court. Kylie Keane on behalf of the Attorney General. This case really presents the question of whether the Board acted contrary to law when it denied the Petitioner's separate motions to reopen and separate Board decisions because they had not shown that they could get past the time bar. That's really what the government thinks is the important key here, is whether they can get past the fact that the motion to reopen was filed five years too late. And to do so, they need to have alleged either changed country conditions, which is what the original motion to reopen alleged, which was filed by Attorney No. 2, Mr. Guajardo, or ineffective assistance of counsel, because those are the only two exceptions that are going to get them around the time bar. Let me ask you about that. Did the Board find that country conditions had changed in Guatemala? In the original merits proceedings, the Board found that in both of the Petitioner's individual cases, yes. No, no. It's a change in location. I asked if they had found country conditions had changed, so there was not a threat from any guerrilla. Yes. They did find that in both of the Petitioner's individual cases. And this Court affirmed both of those decisions when they went on petition to review. Are you sure of that? Because I understand they found they could relocate, but I'm not aware that they said that country conditions had changed. Well, they discussed the peace accords. In both of the Petitioner's cases. They discussed them, but did they make a finding that country conditions in Guatemala have changed? Yes, Your Honor, they did. Can you direct me to that? Yes. I have AR-1203. Thank you. Which is the second page of the BIA's April 11, 2002 decision in the Rosales Peace in Case. Right. So thank you, Your Honor. On page 1203, the Board specifically says that the immigration judge correctly noted that the State Department profile of asylum claims and country conditions for Guatemala reflects that country conditions have changed. Both civil patrols and guerrillas have been demobilized following a peace agreement signed in 1996, and then the Board cites to the country profile at Exhibit 3. So there was an explicit finding here. Thank you. Thank you, Your Honor, for helping me with this. So, well, we know that the time of the motion to reopen, the first motion to reopen, an argument based on changed country conditions is a flat-out loser. Right. Doesn't that begin to suggest what later is a different, the ineffectiveness of the second counsel? But that suggests that instead of applying for that, the second counsel should have looked at the other route, which is the ineffective assistance counsel, ineffective assistance of counsel of the first lawyer, Mr. Gada. Yes. So really, I mean, I think we can probably agree that that's the main issue in this case. It tells us the second lawyer is probably pretty incompetent, because anybody who would put in a motion for reopen citing changed country conditions for Guatemala as a factor for why things ought to be considered for the benefit of the petitioner later is just kind of nuts. Well, not entirely nuts, actually. If you read the motion to reopen that he filed, it's, I mean, this attorney has problems. He's been suspended from practice. So there's really no way around the fact that he's been unscrupulous in other aliens' cases. There's just no question. But the motion to reopen that he filed was not only based on changed country conditions, there's increased violence in the country, but was also raising some of these claims about increased amount of femicide and these issues specifically about women. Let me put it this way. If you were examining it at the time he was examining it to bring the motion for reopen, which is admittedly way late. Right. You know you've got to figure out a way to qualify for one of the exceptions to the time bar. You've already identified the ones you've got to choose from. Right. It's hard to justify a decision to proceed arguing changed country conditions when the alternative of ineffective assistance of counsel kind of screams out there as a possibility, given Mr. Gatta's sad record. Yeah. No, I do agree. I mean. So this gets us to Mr. Gatta. Well, let me, if I can go back to Mr. Gatta for one moment, because he does respond to the State Bar allegations. And he describes why, in considering whether to file a motion for ineffective assistance against Mr. Gatta, that tactically he chose not to. So there's at least evidence in the record from him explaining that he considered it and that he decided not to because he found that Mr. Gatta had not, in fact, been ineffective and had prejudiced their case. So I'm pushing back a little bit because I think it's not entirely clear that Mr. Guajardo didn't consider that route. As a matter of fact, the evidence shows he did explicitly consider that route and chose not to. But to get to, really, to the meat of the case, which is whether Mr. Gatta was ineffective, because if he wasn't, Mr. Guajardo is not ineffective for failing to file. So that's really the heart of the case. And I'm really just trying to get back to Mr. Gatta. Okay. I understand there's an argument with regard to the second attorney, but I think you've properly identified with the heart. So that's what I'd like to get you to focus on. Okay. Well, if the Court will indulge, let's start with domestic violence. And I think it's important to have this conversation with the Court about what the duty is for an attorney to, as current counsel is saying, investigate the facts that would form the basis of claims versus the alien, the asylum seeker's duty or responsibility to bring forth these facts. Because if I can be completely clear, Mr. Gatta did not know that Mrs. Rosales had suffered domestic violence. Mr. Guajardo did not know that she had suffered domestic violence. So I think it's a little bit of a slippery slope to start saying, well, they never told her that could have formed the basis of an asylum claim, because why would they? I mean, they probably didn't discuss other things that formed the basis of an asylum claim either because they're not pertinent to her claim. So you've really got to start with square one. You know, the client comes into the office. You start discussing the facts of the claim. She said nothing about domestic violence. So there was no discussion about whether that formed the basis of a claim. I think that's not the case. Focus for a moment on what the notes show and what the record shows was the discussion when they first came into the office. That may be significant because it could have led to something else. What was the nature of that conversation so far as we know from the record? We do not know because Mr. Gatta did not respond to the state bar charges. So we don't have his side of the story. And to the extent that Mrs. Razzali submitted several affidavits discussing, you know, in support of her motion to reopen, she does not explicitly state what she and Mr. Gatta discussed. She does not explicitly state that Mr. Gatta never asked her about her husband at all, which is what current counsel is suggesting would have led to this discussion about domestic violence, because that's how they found out. An assistant in their office asked her, well, why did you get divorced to your first husband? But I submit to the court she wasn't divorced with her first husband at the time that Mr. Gatta represented her, so why would he have asked her that question? And, you know, we're really getting to this issue of when they have that consultation, is there a checklist of questions? I mean, it seems as though current counsel is imposing a duty on the private immigration bar to ask every woman that comes into the office whether she's been abused. Because if not, what in the record would have prompted her prior attorney to ask her that question? She never volunteered the information. So we just don't, you know, we're at a point where now it seems maybe we can look back because we have the full facts. But in 1997, when Mr. Gatta filled out the asylum application and the two of them went over the questions, which are very open-ended questions, why do you fear returning to your country? Why did you flee your country? These types of things. If she doesn't volunteer the information that forms the basis of this domestic violence claim, how can it be an effective assistance of counsel for Mr. Gatta to fail to tell her that those things might form the basis of a claim? You know, it's somewhat circular. I think your answer is pretty good. Could I ask you about her temporary protected status? Wasn't that something that should have been brought to the up by counsel? You know, I'm not actually sure, Your Honor, what the status is even now, if it's subsequently been extended. But there's nothing in the record to show that they've applied for such status. So I'm not sure that they would even be eligible were the court to remand. But I do not know the current status. I apologize. If it's something Your Honors care particularly about, I will find out for you. All right. So then in regard to oh, there is one more thing I wanted to bring up regarding domestic violence. And this is something that I don't think was particularly clear in the briefs. She had an affirmative asylum application. So in other words, she submitted an asylum application to the Immigration and Nationality Service before she was in proceedings. And she had an interview by an asylum officer. Now, this is the asylum officer that current counsel is saying has been trained in these gender claims, right? The 1995 INS guidelines were submitted and issued in order to train asylum officers on how to spot these claims. The asylum officer who interviewed Mrs. Rosales did ask her about her husband. And we have those notes in the record. This is at page 106 and 107 of the record. And we have that because Mr. Guajardo submitted it in his response to the California State Bar charges. Now, the asylum officer says, and we're talking about the guerrilla claim because that's all that she has brought forward at this point. The asylum officer says, you know, Mrs. Rosales, you've told me that your husband moved to Guatemala City, which is very far away from your hometown where you suffered all this past harm at the hands of these local guerrilla groups. So if your husband lives all the way in Guatemala City, why can't you internally relocate, go live with your husband? And she does not say, I don't want to live with my husband. I fear him. He's been bad to me in the past. Her response, and this is at page 107, says she did not want to join him because she must live with her mother, who's elderly, back in the hometown where she suffered all this past persecution. Now, that's important because it shows that even a trained asylum officer under these INS guidelines that current counsel relies so heavily on, even that asylum officer could not elicit this information from her. You know, and it would be precarious for the court to then impose this duty on Mr. Gata to have gotten this information from her when she explicitly and affirmatively states in her affidavits that this was a very, very sensitive issue that she had only spoken to with three close family members. And that's understandable. These are, you know, if these were proven true in a court of law, they're reprehensible, and it's a very sad situation. But the problem is that she waited 17 years from the time that she came to this country before she told a lawyer about this domestic violence. And, unfortunately, the law is not going to provide for her to get her case reopened because there's nothing that Mr. Gata prevented her from telling these facts or eliciting this testimony. And, therefore, she simply isn't going to be able to get her case reopened 21 years on. So it's an unfortunate situation. The government recognizes these are sensitive issues, and gender claims are an evolving area of the law right now. But in this case, there just is not a way to get her case reopened because of that time bar. If Your Honors have any more questions, I'll submit the rest on the briefs. Thank you. Hello? Your Honors, the Board's decision here did not deny based ñ deny Ms. Rosales' claim based on what the duty of counsel was. They denied it based on whether or not the claim would have been sustainable. And the definition ñ The light is going the wrong way. Can you set it for rebuttal time, please? Fifteen minutes for rebuttal. We're going to have a buzzer beater here today. Who knows? Thank you. Go ahead. Thank you. As I said, the Board denied based on whether or not the claim would have been sustainable under the state of agency law and precedent at that time. And a finding of sustainability doesn't require that the law had been clear that she could have filed for asylum. It's that she could have made a viable legal claim on that basis. And given the precedent, the agency's stated position through the guidelines, through regulations, through the vacature of matter of RA, it certainly was a viable or sustainable claim at that time. And so this Court doesn't need to go into discussion of the duty to advise clients as to what is relevant, although that's certainly a very important role for immigration attorneys. This Court has found, has called immigration law a labyrinth that clients need an attorney to assist them with because it's not always clear what's relevant in immigration law and what's not. And therefore, that is the case why certain facts may not have been disclosed to an  And the client is unaware that certain facts are relevant to bring to the attorney's attention. In this case, Mr. Guajardo, neither Mr. Guajardo nor Ms. Gata ever asked our client whether or not she had experienced abuse in, from her first husband in Guatemala, and therefore she didn't know to present it as relevant evidence. Well, is there really prejudice in the case if someone does ask her under oath at the hearing? That is, she has an opportunity to speak at that time. Well, again, her answers at the hearing in front of an immigration judge are informed by what she understands to be relevant in such a hearing. No, it's informed by telling the truth to a question that's asked. That's all there is to it. That's just testifying. She can't know all the law thing. You can't charge her with that. She just testifies. Again, I don't see it as a matter of telling the truth or not telling the truth. It's a matter of understanding what, you know, what part of the stories are relevant for the court and believing that that part wasn't relevant because her attorney never advised her that that could be relevant. And, you know, this is the same reason why this area has been in so much dispute. Why the gender guidelines issued by CIS were issued is because oftentimes people don't know to mention these, you know, these issues. Well, how about the interview with the asylum officer? When he asks why she doesn't go back to Guatemala City, she says nothing apparently about her husband, refers to wanting to stay with her mother. Now, that's not being guided by her attorney. That's asking, answering a factual question. Well, her asylum application in this case had been prepared by her attorney, by Mr. Gada, prior to her applying. He had prepared her affirmative asylum application case. And it was... They're answering questions from the asylum officer. Right. Again, she would not have known from the asylum officer that this was relevant either unless she had been advised prior to that appointment that perhaps this is something that the asylum officer would be interested in. I think you're missing the point. The point is that she was asked why she didn't go to Guatemala City to be with her husband. She did not say because I fear him. She says because I have to go take care of my mother. That's an under oath response. It has nothing to do at all with what she's been advised or not been advised. And the difficulty that you have to get over, it seems to me, is how do you get over that all of this is relevant at all? That is, where's the prejudice if in fact she went to live with her mother and that's the reason she didn't go to Guatemala City to live with her husband? I understand it puts you in a box. It's not an easy question. But how can we say there's prejudice in this case when she makes the under oath statement that the reason she's not going to go to her husband in Guatemala City is because she has to go to her mother? That's the reason. What do we do with that? Well, the overarching issue is that she has an asylum claim that had never been presented because she was never advised that that would be relevant to present to the asylum officer, to the immigration judge. Her attorney, who has the closest relationship with the client, didn't advise her, and so she didn't know that that was part of the story that she had to also present in addition to the other reasons she would have had for her actions. And that claim would have been legally sustainable throughout this whole time and it's never been presented.  I want to assure you that no one's going to charge you with being an ineffective counsel. Thank you, Your Honor. The case just argued is submitted. We thank both counsel for their helpful arguments.
judges: Wallace, Noonan, Clifton